The 4th District Appellate Court of the State of Illinois has reconvened. The Honorable Robert J. Steigman presiding. Thank you, Mr. Bailiff. Our first case this afternoon is case number 4-23-0893 in Reyes State of Gullikson. Let me ask the lawyers to identify themselves. Counsel for appellant, please state your name for the record. Yes, good afternoon, Your Honors. Kathryn Weiler on behalf of the Defendant's Appellants, Dr. Minori, Dr. Weiss, Nurse Practitioner Green, and Medical Pain Management Services Limited. You pronounce your name Weiler? Weiler, Your Honor, yes. Counsel for the appellate, please state your name for the record too. Yes, Your Honor. Josh Weisberg on behalf of the Plaintiff Appellee, the Estate of Sheila Gullikson. Thank you. Ms. Weiler, you may proceed on behalf of the appellant. Thank you, Your Honor. May it please the Court, again, my name is Kathryn Weiler. I represent the Defendant's Appellants. The Defendant's Appellants are asking for different relief from the Court. The first, Nurse Practitioner Green and MPMS, which is the practice group, Medical Pain Management Services Limited, are asking the Court for JNOV on the claims against them to be clear when we're discussing those claims against MPMS. We're talking about the institutional negligence claims directly against MPMS. There is an agency claim that is not being argued as part of the JNOV issue. The second issue, though, relates to Drs. Minori and Weiss, and they are entitled to a new trial, because the jury's verdict against them was against the manifest weight, and also because there were issues with improper testimony, and particularly with closing argument, that so prejudiced Drs. Weiss and Minori that a new trial is necessary. Take those issues one at a time, starting first with a preliminary point. I recognize that the Court is familiar with the record, and I won't re-explain all of the facts, but I do think it's important as a baseline to the argument to be reminded of what exactly is the fundamental nub of the issue on appeal, and that's about causation, the causation of Ms. Gullickson's stroke. Ms. Gullickson suffered a stroke on April 7th of 2019, and the cause of that stroke is and has always been disputed, which is crucial to the analysis of these claims. Plaintiff alleges that the stroke was caused by a lack of CSF, CFS is cerebral spinal fluid, that was caused by a dural defect. The dural defect allegedly occurred during a surgery performed by Dr. Minori on February 14th of 2019 to insert an intrathecal pain pump into the decedent. According to the plaintiff's theory, during that procedure, there was a dural defect caused. Ms. Gullickson began leaking CFS, I'm sorry, CSF. She leaked CSF for several weeks, leading to irreversible intracranial hypotension. Then she developed a blood clot while she was in the hospital between April 1st and 7th and suffered a large right brain stroke that was fatal. That is the plaintiff's theory. The defendants have provided evidence of a very different cause of the plaintiff's, I'm sorry, of Ms. Gullickson's stroke. The defendants provided evidence at trial that the stroke was not related to any of the physician's care. Rather, there were several potential issues that led to Ms. Gullickson's hospitalization and subsequent stroke. And there is extensive testimony about that in the record. That distinction is important, and it's important because this is not a case where the cause of death is accepted and conceded on both sides. There is a dispute about that. And with that baseline in mind, that's where we can move first to our discussion about Dr. Green and why Dr. Green is entitled to J&OV in this case. Again, that's very different from Drs. Minori and Dr. Weiss who are asking the court for a new trial because the evidence at trial is against manifest way to the evidence. Counsel, I have a question for you. Yes. Didn't plaintiff's experts, and I believe this would be Dr. Size and Dr. Amos, didn't they testify that if defendants had urgently referred Sheila to a neural surgeon consistent with standard of care required for each encounter between February 19 and March 26, 2019, that the CSF leak could have been repaired before the blood clot formed between April 1 and April 7, and Sheila would have lived? They did, Your Honor. That is absolutely what they testified. Okay. Now, if the jury believed that testimony, why wasn't that sufficient to sustain the plaintiff's theory of the case? For two reasons, Your Honor. Number one is Dr. Z, who is the neuroradiologist, didn't testify about causation. But more importantly than that, plaintiff's own experts, and this is about plaintiff's experts, testified differently when it came to causation and exactly what was possible while Ms. Gullickson, during the course of her hospitalization. And that's the distinction, again, that we have between JNOB and between manifest weight, because we recognize there is some testimony of record about whether or not there was need of an urgent referral, but it would not have resolved the issues here. So Dr. Fessler, who is plaintiff's causation expert, that's plaintiff's expert neurosurgeon, Dr. Fessler testified that if the dural leak had been repaired by April 4 of 2019, so that's over the course of the hospitalization, there would have been, and this is a quote from Dr. Fessler, immediate correction of the CSF volume and the stroke would have been prevented. So here's the question. You cite the various different experts who testified, but the jury heard all this. So my question is, if there was an expert or even two experts who testified to a matter that would support the plaintiff's theory, why wouldn't they be permitted to believe that, notwithstanding what you just said? Because again, Your Honor, it comes back to establishing causation. So, and I will, I'm trying to answer the question. Well, the testimony is, if it wasn't the testimony that Sheila would have lived, didn't they testify that Sheila would have lived? They do, they testify that she would have lived, depending on certain, had certain care been given during her hospitalization. That is the distinction here. And the reason that's important. Wasn't it based upon if the defendants had urgently referred her to a neurosurgeon? Wasn't that the key? That's the testimony that she should have been, that she should have been urgently referred to a neurosurgeon by March 26. However, they also proceed to testify that her condition either was stable, meaning she had sufficient CSF at the time of her hospitalization, or her condition could have been stabilized at that time. And this is why that's important, Justice Steinman, because the jury instructions lay out exactly what the issue here is. The jury instruction, the issues instruction is at page C1461 in Volume 2 of the record. The jury instructions say, as to Dr. Minori and Dr. Weiss, that they failed to timely refer Ms. Gullickson to a neurosurgeon for evaluation and treatment of her cerebral spinal fluid leak. However, Ms. Gullickson was under the care of a neurosurgeon as of April 1. That's the time of her hospitalization. And the testimony, including from plaintiff's experts, is that a procedure could have been performed, that's Dr. Fessler, who states that the dural leak could have been repaired, or there is evidence in the medical records. Now, this is to be clear, not from plaintiff's expert, but from the medical records that establishes that as of the time of the placement of the dural drain, which was on April 5, she had a brisk return of clear spinal fluid, which indicates that she had sufficient pressure and volume of her spinal fluid. And at that point, she could have been stabilized. That's why this is different, because we're not just talking about the need of an urgent referral that never happened. Ms. Gullickson was under the care of a neurologist as of April 1. And Ms. Gullickson and plaintiff's own experts testified that at that point in time, that now, again, as Justice Eggman, you point out, they do have different opinions, but fundamentally, they have also conceded that as of that point in time, her condition could have been stabilized or was already stable. And that's the problem. That's the issue with causation here. It's that those two considerations have to come together, exactly what the alleged malpractice is, and exactly what the evidence established could have been done. That is a causal break. This issue is about timing. If Ms. Gullickson had sufficient CSF volume or was stable or could have been stabilized after her admission, then there's no causation. And even plaintiff's experts seem to have testified that. That's Dr. Amos as well. Dr. Amos testified. Well, if I may, though, even if we arguably assume the CSF was normal on April 1st, that doesn't necessarily foreclose the possibility that she had a stroke after that date because of a CSF leak, correct? I want to answer that question, Justice Lanner, but it takes a little bit more than a yes or no. And here's why. Well, let me add my second part of that, though, because when we look at our standard, if we arguably assume that the CSF was normal on the 1st, how is the opposite conclusion clearly evident? Because that's the standard we have to work through when we're talking about the jury verdict being against the manifest weight. And I'm only focusing on that component at this point. Understood. So, first of all, Dr. Alexander, this is the medical records, again, not plaintiff's expert, but the medical records where there is the discussion of the brisk return of CSF fluid. That's on April 5th. So that is not April 1st. And some of the testimony is, again, not limited to April 1st. So to the court's question, which is, why do we have to assume that if she's potentially stable, arguably April 1, why can't we find that there's still causation that goes back? It's because there are two reasons for that. Number one is that the testimony given at trial is that she still could have been stabilized over the course of the hospitalization before the stroke, which is important because that breaks the causal connection. It's not just April 1st. It's April 1st, 2nd, 3rd. There is testimony about those dates in particular. And the other is because, again, it goes back to exactly what the issues instruction states. It's that the plaintiff should, I'm sorry, that the plaintiff required an emergent referral to a neurosurgeon as of March 26th. Well, we know by April 1st, she was under a neurosurgeon's care. I'm sorry, a neurologist's care, I misspoke. And we know, to your point, Justice Lannard, the testimony establishes that over the course of that hospitalization, she could have been stabilized. So it's not just a matter of, did she have sufficient CSF on April 1st? It's, could she have been stabilized over the course of that hospitalization while she is under the care of a neurologist? And the answer to that is yes. And it's yes, based on the testimony of plaintiff's own experts. Now, plaintiffs do have a standard of care expert who disagrees with that, but he's the standard of care expert. That's Dr. Carini. I believe I'm saying that right. I apologize if I'm not. But Dr. Carini, the anesthesiologist, has different opinions about how, what steps should have been taken to conduct a dural repair, or whether there should have been different action taken and when, and that there should have been different steps taken over the course of the treatment. But at the end of the day, standard of care is not the dispute here. The dispute comes back to causation. And that's why the timing becomes so incredibly important, because we're not just talking about whether there should have been a referral, for example, February 14th or February 21st or February 28th, because there are some discussions about those dates. There's not an argument in the issues, I'm sorry, there's not a direction to the jury in the issues instruction that as of that point in time, there could be no remedy, there could be no relief for the plaintiff. What the plaintiff has argued, and what the plaintiff's experts testified to, goes back to the dates that I gave the court earlier. So plaintiff's causation evidence is that there needed to be a referral by March 19th on a regular referral basis, or an emergency referral by March 26th. That's why the timing becomes so incredibly important, and we have to talk about the causation. That's the testimony that's missing here. That's what was not given at trial. And although there is some testimony to the contrary in the record, it doesn't meet the standard for a finding sufficient to get past manifest wait. That's the issue. And there is a reason, which plaintiff's counsel pointed out, the defense did not move for a directed finding. The defendant did concede that there is enough evidence of record to get past the Cheyenne OB standard. But that's not the standard that this court is considering for a new trial. That's related to the evidence itself on the claims against Drs. Weiss and Minori, and why they are entitled to a new trial. That is not the only issue related to Drs. Weiss and Minori, and why they are entitled to a new trial, though. There was error caused by improper closing argument and improper testimony that violated the party's motions in limine. That becomes important because, as we've just been discussing for nearly 15 minutes, the evidence of record was close. This was a close case. It was a difficult case. Certainly, the defendants think that the evidence wasn't so close that the plaintiffs can survive a manifest wait challenge. But there is testimony of record sufficient to get past a Cheyenne OB. That's where improper closing argument becomes an issue. And these are issues in closing argument that the Illinois Appellate Court has addressed recently, and why these are problematic points to make in closing argument. What points are those specifically? We're talking about, for example, argument about the value of a human life. There was one comment about what's the value of a human life? Well, that's something you specifically cannot raise with a jury. There were questions raised or themes about safety. The law is our protection against those who violate safety standards. Counsel, if I can direct your comments with regards to the comment about the value of life, and I'll combine that with the statement, what happened to Sheila could have happened to any of us. Even if we find those were improper, the trial court did sustain the defendant's objection on those two matters, correct? That is correct, Your Honor, although it's worth pointing out the trial court sustained the objection, did not direct the jury in any way after that, did not direct them how to interpret the sustained objection. Okay, disregard the statement. And then the former comment was the last sentence, I believe, in Plano's counter-rebuttal argument. So then immediately following that, the court advises the jury that it must determine the matter based on the facts of the case, only on the evidence and inferences to be drawn therefrom, and that the verdict cannot be based on speculation, prejudice, or sympathy. Why is that instruction not sufficient to cure, if you will, the court's failure for any further statements beyond sustaining the objection? Why is that not sufficient with regards to those two statements? For two reasons, Your Honor. One is because that's not the only comment that was made. So we have to, as the court knows, we have to look at the closing argument as a whole, and that's not the only time this problem of safety and accountability was raised during closing arguments. And I'm not addressing the safety or accountability. I'm just addressing those two comments with regards to the question about the value of human life and the statement with regards to what happened to, I think they used her first name, what happened to Sheila could happen to any of us. That's correct. And I apologize, Judge. I'm trying to answer the question, and frankly, some of the problem of answering the question is the interpretation that the defendants have of those statements is that they do connect to the comments about safety and accountability, because they are all of a piece. That is very much, and it is exactly the language the court quoted, what happened to Sheila could happen to any of us. Don't let them get away with this. That is very much a safety issue. That is very much an accountability argument. And that's why it's so problematic, particularly in the exact moment where it was given. So the court has asked why isn't sufficient that the trial court directed the jury in how it is supposed to interpret the evidence of trial and to disregard inappropriate argument at that point. Those are the last words that the jury heard from the attorneys in this case. That was the end of rebuttal argument. That was it. And at that point, that is the last thing the jury is left with, an argument that's being improperly made about. And again, I recognize we may disagree about the specific theme ascribed to those words, but to the defendants, that is very specifically about accountability, about safety, and about the value of a human life. All of those things are prohibited from discussion. Can there be situations in closing argument where they are raised inadvertently, the court corrects it, counsel corrects it, the parties move on? Absolutely. But unfortunately, in this case, it was such a significant argument to be made, and it was such a significant theme. In the context of the entire closing argument, it simply cannot be disregarded, and it necessitates a new trial. The prejudice of those words is really, really straightforward. And that's, again, where we look at some of the precedence the appellate court has issued within the last 10 years. So, Sikora v. Parikh, which is a 1st District case, I recognize it's not a 4th District case, but a 1st District case. Konowoko, which is a 2nd District case, both reverse jury verdicts based on comments made during closing argument that specifically address these types of concerns. We've also discussed quite a bit in our papers the McCarthy case, and I recognize McCarthy is actually a more extreme example than this case. In McCarthy, there is extensive discussion throughout closing argument, which necessitated reversal. But this case is more analogous to the issues in Konowoko, where there is also a reversal. And it is a similar problem in terms of theme. Asking the jury to put itself in the shoes of—in Konowoko, to be clear. In Konowoko, asking the jury to put itself in the shoes of one of the parties, or asking the jury to focus on a party's financial position. That is problematic, and even when it is only raised a few times during closing argument, it does necessitate a new trial. And the last point I would make on this before my time is up— Oh, yes, just a second. Bless you. The last point I would make on this is that relates that last point to a party's financial position to questioning that was raised during trial, very deliberately, despite the existence of an eliminating order that said the parties can't be asked about financial position. They were here. So the jury had heard all of that evidence. Excuse me. Are you familiar with the Kitchens v. Berg case, 264 Illinois Appellate 3rd, 926? Off the top of my head, I apologize, Judge, I'm not. I can look at it. And I guess my—to just—with regards to the questioning of the children here, are you arguing that it was information that was intentionally elicited, if you will, or if it's just a situation where counsel's asking questions and it happens to be a witness gives a response beyond what we would anticipate would be within the parameters of the prior grant of the motion eliminating? So initially, Your Honor, I believe it was the latter. It was an unintentional—it unintentionally elicited that response about finances. But when you look at the sidebar, the conversation that was had at sidebars that are 1813 to 16, Plaintiff's counsel does not agree with the court's ruling sustaining those objections and argues that plaintiff's counsel should be allowed to elicit that information, which is in contravention to the eliminate order that was entered by the party's consent. So that's the problem with that information. Your time is up. You have an opportunity to address this again in rebuttal. Thank you very much, Your Honor. See you. May I have a rebuttal, please? Absolutely. Thank you, Your Honor. Good afternoon, and may it please the court. Your Honors, I first just want to start by pointing out that Judge Bartsch, who presided over this two-week jury trial, of course, heard all of the same arguments that we just heard. He found that they had no merit. He held that the trial was fair and the jury's findings were well supported by the evidence. And so I want to start by discussing the defendant's arguments that Judge Bartsch abused his discretion. And I'll start with proximate cause, because that's where the court spent the majority of the time. And I want to just clarify exactly what the plaintiff proved with regard to proximate cause, because it was really overwhelmingly proven in the plaintiff's favor. In fact, I think that an argument could have been made that it would have been against the manifest wit of the evidence to find otherwise. So here's what the plaintiff proved with regard to proximate cause. The defendants negligently caused a woman to start leaking spinal fluid outside of her body during this procedure on February 14th, 2019, which is a potentially life-threatening condition. And one of the ways that it can be life-threatening is that if you develop intracranial hypotension, then that can lead to a clot forming, which can cause a stroke. So over the course of the next six weeks, they see this lady again and again, Ms. Gullickson, and she's complaining of worsening symptoms of intracranial hypotension. It starts as mild headaches, dizziness, nausea. It progresses to 10 out of 10 intolerable headaches, photophobia, and eventually neck pain and neck stiffness. And this is severe intracranial hypotension now. And this is over the course of six weeks. So our experts testified that the standard of care right away was to urgently refer her to a neurosurgeon who would have stopped that leak and stopped that intracranial hypotension well before a blood clot would have ever developed. Both parties agree that the clot developed between April 1st and April 7th. So we have like a dozen blown opportunities here where this lady is complaining of worsening intracranial hypotension, which by definition means that you don't have enough CSF in and around the brain. That is what causes these symptoms. And even the defense experts admitted that Ms. Gullickson was documented to have intracranial hypotension right through the time of her death. Dr. Lubenow admitted that. And so it was well established. It's in the records on April 4th. They're documenting that she has severe symptomatic intracranial hypotension. It's even in the record on April 6th. So it's right up until she develops this clot. It's well established that she has intracranial hypotension, which everyone agrees means you don't have enough CSF in and around the brain during that time. And that is a clinical diagnosis. So a CAT scan can rule it in, but it can't rule it out. So our experts certainly never agreed that it was ever stabilized. Our experts said basically that no. And even Dr. Lubenow, the defense expert, admitted she had intracranial hypotension through her death. So our theory was, listen, if the standard of care was to urgently refer her to a neurosurgeon on February 19th. If that happens, our neurosurgeon expert says you fix that leak within a day and she's fine and she lives. Then she comes back on the 21st. Now she has worse symptoms. The standard of care is the same. Send her to a neurosurgeon and he's going to repair that neural defect that was caused that started this leak. And if you do that, she'll never develop this clot. She's going to live and so forth. So in terms of proximate cause, there are like a dozen deviations of the standard of care that proximately caused this blood clot to develop before she ever gets to the hospital on April 1st. Now, she doesn't actually see a neurosurgeon until April 4th. And why is that? That's because she's not referred for any urgent referral or emergent referral by the defendants. But she falls down because of this dizziness she's experiencing. She's admitted to the hospital. And, you know, these ER doctors who don't really know what's going on, one of the things that they end up doing is having her see a neurosurgeon. And he documents that she has severe intracranial hypotension. She's leaking CSF through her bed sheets, through her clothes. And this has been going on for six weeks. And now they're asking me to try to fix this. And it was well established that at that point. So, first of all, I just want to distinguish that there's two different problems with the defendant's argument. The first one is we're not required to prove that the defendant's conduct was the sole proximate cause. We're required to prove that it was a proximate cause. And there's like a dozen deviations of the standard of care that were all a proximate cause of her developing this blood clot, which led to her fatal stroke. So that's the first problem. But the second problem is that even if you were to take all reasonable inferences in the defendant's favor and find that there was somehow still some opportunity to save her within those last few days. The evidence is well established that before she has a contaminated infection. And there's numerous witnesses, including the defendant's neurosurgeon, who said this. And I'll quote his testimony in a moment. But before she has an open contaminated wound, which happened on February 28th, you can do a direct repair of the dura to stop the leak. But once she has an open contaminated wound, that's really contraindicated because you can spread the infection. So from February 28th on, the only way that you can stop this leak is to put in a what's called a diversion drain and it works. And the defense expert admits it works, but it takes five to seven days to work. OK, so basically, if she's referred to a neurosurgeon any time up until the defendant, the end of the defendant's care, February 19th, they're going to do a direct repair of the dura. She's going to live February 21st direct repair of the dura. She's going to live March 1st through 5th. They have her in the hospital under their care. Now we're going to do a diversion drain. But if within five to seven days, it's going to stop the leak and she's never going to develop this clot in early April a month later. They see her again. She's calling March 6th through 8th. She's in the office March 14th. They're doing a diversion drain five to seven days. If we do it, if we refer her and she gets a diversion drain, it's still well before everyone agrees on April 1st. She still has no clot because she had a CAT scan that day. No clot. So both sides agree that's going to stop this before she ever develops this fatal blood clot. And I want to read to you briefly. So we have, you know, four experts who actually testified to proximate cause that, you know, if you sent her to the neurosurgeon before, you know, by March 26th at the latest, then she's going to live. But once you get into early April, you don't have time for this diversion drain anymore. So it's not really even necessary that we prove that aspect because we've already proven all of these deviations that would have prevented her death before that. But we did prove, you know, that even as of early April, what Dr. Amos and Dr. Fessler are saying is, listen, you had six weeks to send her to a neurosurgeon and she's going to live. Now we're in early April and we're talking about is it still possible to save her at that point? And the defense expert even admitted, well, the only option is a diversion drain. And so that's going to take too long. And so let me read to you what Dr. Bauer, the defense expert neurosurgeon, testified. This is pages 240, 2421 through 2422 of the record. Are you aware that Dr. Alexander, he's the treating neurosurgeon, testified, if the patient has a contaminated or infected wound, then his preferred approach to stop the leak is a diversion drain? True. Answer, yes. And you saw Dr. Alexander did in this case, after he was consulted, insert a diversion drain on April 5th. True. Answer, yes. And Dr. Alexander testified he felt that a diversion drain was very likely to stop the leak within five to seven days. True. Answer, yes. You have not taken a patient back to surgery with a contaminated wound to do a direct repair of the dura for a CSF leak. True. I don't believe I have. Yes. And you would be extremely reluctant to do a direct repair of the dura once the wound's contaminated or infected. True. Answer, yes. And you testified that what Dr. Alexander did is exactly what you would have done. And it was a good decision. True. Answer, yes. And you also agree that if Ms. Gullickson had not died first, you would have expected the diversion drain to have likely allowed her dural defect to heal within five to seven days. True. Answer, yes. So in other words, if she hadn't died, you would have expected her dural defect to have healed by approximately April 10th or 12th. True. Answer, yes. So they just waited too long. I mean, they had six weeks. And every single one of those deviations of the standard of care was a proximate cause of her death because had they ever gotten Ms. Gullickson to a neurosurgeon during any of that time, she would be alive today. And so that was the plaintiff's theory on proximate cause, which I think we overwhelmingly approved. Counsel, if I may, just given where we are with the time, I want to make sure that we have some time to discuss judgment in OB with regards to nurse practitioner Green, as well as MPMS, if we could spend just a few minutes there. It appears to me that the plaintiff presented expert testimony that Dr. Herancini, and I apologize if I pronounced that incorrectly, there was a failure to communicate Ms. Gullickson's symptoms to the supervising physician, that that was a deviation from the standard of care. We've talked about the reasonably prudent anesthesiologist. Hearing that information would have referred her under the plaintiff's theory for a neurosurgical intervention. Also, Dr. Herancini testified MPMS did not train nurse practitioner Green to recognize the symptoms and failed to adequately supervise. And then talked about both of those he opined contributed to those deviations from the standard of care contributed to causing Ms. Gullickson's death. My question, though, is setting forth that information. Do the facts that Dr. Amos testified that Ms. Gullickson's death could have been avoided with information as late as the first few days of April, and that was about two weeks after nurse practitioner Green was last involved in the care. And the fact that Drs. Weiss and Minori said they were aware of the worsening symptoms, even though nurse practitioner Green had failed to adequately communicate those. Does that evidence somehow negate Dr. Herancini's expert testimony on the issue of proximate cause with regards in particular nurse practitioner Green's failures to communicate? Thank you, Your Honor. So I'll address the two parts of that question. The first one, in terms of the timing, the fact that she wasn't referred on February 19th was a proximate cause. The fact that she couldn't that she could have also been referred on February 21st doesn't make it so that it wasn't a proximate cause on February 19th and so on. So the timing aspect of it, nothing about the fact that if Dr. Minori or Dr. Weiss did the right thing later takes away the fact that it was a deviation of the standard of care and had the right thing occurred on February 21st, she would have lived. So so now we're going to I'm going to address your other point, which is the main point, which is what's the evidence that it made a difference to Dr. Weiss and Dr. Minori. Right. Which is the defense's argument here. And the fatal flaw, the biggest fatal flaw of that argument is that neither of them were the supervising doctor on the day that nurse Green saw her. So nurse Green sees let's just take this chronologically. So February 19th, Ms. Gullickson comes into the office, sees Dr. Minori, reports that she's got a leak that's been going through her shirt. And Dr. Minori says, OK, come back in four weeks, but come back sooner, like two or three days or by Friday, I think he said, if you develop a headache or other symptoms. So that was important information that that he told her. She comes back two days later. That's when she sees nurse Green and she reports a headache, nausea and dizziness. And if you look at as much as the defendants want to erase this fact, Dr. Minori is out of town for a month now. OK, so Dr. Minori is out of the picture. Who's the supervising doctor that day? Dr. Katawala. It's right in the record. So Dr. Carinci, as your honor correctly stated, said that nurse Green failed to report this information on February 21st, that this patient has now developed the symptoms she was told to come back for. She's reporting that to nurse Green and he had an obligation to report that to his supervising physician. Well, who is that? Dr. Katawala. It's in supplemental appendix page three. It says right on there in the last sentence of the assessment, this patient was evaluated under the collaborating physician, Dr. Katawala. So then if we want to go beyond that, I asked nurse Green about this and I'm looking at pages of the record 2090 through 2091. And I asked him, I understand Dr. Minori was not the physician in the office that that day. And you stated in your note at the bottom, the patient was evaluated under the collaborating physician, Dr. Katawala. True answer, yes. And that just meant Dr. Katawala was available if you felt you needed to consult with him. And he answers, he was available at a minimum by telephone. And I said, okay, so that was not necessarily in the, he was not necessarily in the office. Answer, I'm not sure if he was or not. Question, but in any case, you did not actually discuss anything about the February 21st offices with Dr. Katawala. True answer, true. And to your knowledge, neither he nor any other physician reviewed reviewed your note that day. Right. True answer, not to my knowledge. So Dr. Karinci's testimony as Judge Bart recognized was, had this, had these red flag new onset symptoms been reported to the supervising anesthesiologist, a reasonably careful anesthesiologist would have urgently referred the patient to a neurosurgeon. So, I mean, the question is, when taking the evidence in the light most favorable to the plaintiff and with all reasonable inferences drawn to the plaintiff, doesn't that mean that there's evidence that Dr. Katawala had even given this information would have made that urgent referral? And the answer is yes. And there's nothing to refute that. Okay, so that alone defeats the defendant's argument. They want to pretend that he, that Dr. Katawala wasn't the supervising doctor, but unfortunately he was for them because he would have in all likelihood made this referral and saved Ms. Gullickson's life. In terms of what Dr. Minore did or didn't know, you know, it's interesting because he says, come back if you develop a headache or other symptoms. Now, we don't have to even get to this because of the Dr. Katawala piece. I mean, we've already established that we've met our burden, but Dr. Minore on February 19th, when he's telling her, come back if you develop a headache or other symptoms, he's saying that for a reason. And it's because then I'm going to suspect a CSF leak and, you know, I'm probably going to do something about that. Now, when he next sees her, it's a month later. And counsel, just briefly, if you can speak to the Snelson case, as far as similarities or any ways you think that case is distinguishable. I know you're limited on time. Right. And I want to briefly address the last part of this as well. So, listen, Snelson says a plaintiff would always be free to present expert testimony as to what a reasonably qualified physician would do with the undisclosed information. And so here it's clearly the case that we're talking about what Dr. Katawala would have done with that information. Even if we were talking about Dr. Minore, he doesn't see her for another month. It's a completely different clinical picture. And whether the jury would believe what he has to say about what he would have done if he knew that a month earlier. I mean, I think that's still an issue of fact, but we don't need to reach it. It doesn't really matter since Dr. Katawala was a supervising physician. The last part that I want to make sure is very clear is that the defendants, of course, have the burden to prove that Judge Bartsch abused his discretion when he found the trial was fair. And over the course of this two week trial, I want to make some observations of how incredibly fair this trial actually was. So the first one is that there was never any argument during the trial by anyone that any prejudicial error had occurred or that the trial had been unfair to any party. There was no motion brought by anyone requesting a mistrial. The second observation is even on appeal, there are no claims that Judge Bartsch made any error in the admission or exclusion of evidence. Third, there are no claims on appeal of any error with the law given to the jurors in the instructions. So it's uncontested that this jury was given all the evidence they should have been given and was properly instructed on the law. Fourth, in terms of what that evidence and law proved, the defendants do not contest on appeal that the plaintiff presented sufficient evidence proving all allegations of negligence against each of the defendants. Fifth, the defendants do not contest on appeal that each of the jury's damages awards was fair, reasonable, and well supported by the evidence. They're not claiming that there was any excessive damages awards. They're not claiming that any of the damages awards were unreasonable. They're not seeking remitted. So with that background, with the defendants having made no claim during trial that anything prejudicial occurred, and on appeal making no claim of error with regard to the evidence presented or law given to the jury, and conceding there was sufficient evidence supporting the jury's findings of negligence and damages, can they show that Judge Bartsch abused his discretion when he held this trial as fair? I would respectfully submit that they cannot, and as Judge Bartsch also observed, the jurors were asking questions throughout the trial and deliberation, which showed that they were basing their verdict on the evidence and law. Thank you, Counsel. Your time's up. Ms. Weiler, you may present rebuttal argument at this time. Thank you, Your Honor. First, I'd like to start with the last point Plaintiff's Counsel made, which is correct. The defendants have not challenged everything that happened at trial. And Plaintiff's Counsel is correct that Judge Bartsch certainly ran his courtroom appropriately and tried to provide the parties with a fair trial. Nonetheless, the issues that the defendants have raised in their briefs necessitate a new trial or a JNOB for Nurse Practitioner Green for all the reasons we've already discussed. I'd like to focus on that second point about Nurse Practitioner Green for most of my rebuttal. And the starting point for that really comes from this discussion about Dr. Kadwala, the supervising physician who was on duty one of the days that the plaintiff claims that Nurse Practitioner Green deviated from the standard of care. And there's a fundamental problem with trying to argue that somehow the existence of a separate person apart from Dr. Minori and Dr. Weiss creates a situation in which it is appropriate to find that the deviations, the alleged deviations from the standard of care by Nurse Practitioner Green caused Ms. Gullickson's injuries. The problem is this. There is no evidence in the record that anything about Ms. Gullickson's care would have been any different if Nurse Practitioner Green had spoken to Dr. Kadwala as opposed to maintaining the records he maintained, providing the care he gave, and working directly with Drs. Minori and Weiss. And this is an issue specifically addressed in Wilcox. Wilcox is the recent First District case that talks about this problem with causation. And when nurses, in Wilcox it was related to nurses over the course of a hospitalization. Here it's related to Nurse Practitioner Green. When there is a break in the causal chain. This is in Wilcox. It's 2024 ILAP First 230355. Paragraph 103 discusses exactly what the problem is. In Wilcox, there had been an argument that the surgeon would have started the process of preparing for surgery earlier had the nurses communicated better with the physician. And that's exactly the allegation here. Remember, we go back to the issues instruction. The issue alleged as to Nurse Practitioner Green was one of failure of timely communicating. It's failing to adequately communicate Ms. Gullickson's worsening post-operative symptoms to a physician. Well, in Wilcox, the court specifically found that there, you cannot establish that there would be a difference in the care. That somehow causation, that somehow there would have been a different result in terms of causation just because it is quote contingent, speculative, or merely possible. That's actually paragraph 102. And the court goes on to explain, the first district explains that they agree just because something in theory could have occurred, it's still too speculative and contingent to serve as an evidentiary basis by which a jury could conclude that the alleged deviation from the standard of care by a nurse somehow is the cause of the delay, the ultimate delay in treatment. And that's the allegation here. The allegation here is that Nurse Practitioner Green failed to communicate his observations about Ms. Gullickson's condition, and that led to a delay in her care. But there's nothing that suggests that somehow Dr. Kothewala or any other treating physician at MPMS would have taken a different course of action from Drs. Minori and Weiss, who were Ms. Gullickson's primary treating physicians. There's nothing in the record about that. And that's plaintiff's burden. That's the plaintiff's obligation to prove. That's the problem with causation in this particular case. Counsel, if I may, with regards to this issue, when we look at the Snelson case, in the Snelson case, we talk about whether the failure to disclose was approximate cause of the plaintiff's injury. And the suggestion is made by the Supreme Court that if they present, unlike in Snelson, where the plaintiff did not present any expert testimony, that they could present expert testimony to discredit a doctor's assertion that the nurse's omission did not affect the decision making. And I guess my question is, in this case, isn't that what plaintiff has done to the testimony of Dr. Karensky? My apologies. Not at all. I do the same. And I apologize to the court and counsel for that. No. And the answer is no, because the court is correct in its reading of Snelson. Certainly, that's what the Illinois Supreme Court said. Certainly, that was the context in Snelson was that there was no expert testimony on that point. The difference is in Wilcox, there was. And that's why Wilcox is so crucial to this court's evaluation of this case. There was testimony there that the nurses care. There wasn't their testimony here in regards to that, that the failure to communicate those symptoms to the supervising physician constituted deviation of the standard of care. Wasn't that stated here? I'm sorry, Judge. Yes, from the standard of care, not as to causation. It does not establish causation. And that's why there. Can you opine, though, that nurse practitioner Green deviation from the standard of care contributed to Ms. Gullickson's death? Wasn't that presented as an opinion? Yes, it is. And it is not established, was not established. And that's why J.N.O.B. obviously is a burden problem. There needs to be some proof of that. That opinion is not enough. And it's not enough because it cannot be based on speculation or conjecture, particularly in this case where you have testimony from the physicians in charge who said it would have been no difference. And there is no other testimony from any other physician, including the supervising physician that they're talking about that suggests there would have been a different outcome. I realize my time is up. If there are further questions, I'm happy to address them. Thank you, Counselor. Your time is up. The court will take this matter under advisement and issue a decision in due course.